IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FOREST SERVICE EMPLOYEES FOR ENVIRONMENTAL ETHICS,<br><br>    Plaintiff,<br>  v.<br><br>UNITED STATES FOREST SERVICE,<br><br>    Defendants.<br>_____/ | No. C 05-2220 SI |
| ENVIRONMENTAL PROTECTION AND INFORMATION CENTER, et al.,<br><br>    Plaintiffs,<br>  v.<br><br>UNITED STATES FOREST SERVICE,<br><br>    Defendant.<br>_____/ | No. C 05-2227 SI |

**ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION**

On June 22, 2005, the Court heard argument on plaintiffs' motion for preliminary injunction. Having carefully considered the arguments of counsel and the papers submitted, the Court hereby GRANTS plaintiffs' motion.

**BACKGROUND**

In 2004, a forest fire burned approximately 4,030 acres of public and private forest land in Northern California. The fire is commonly referred to as the "Sims Fire." Among the areas damaged by the fire was the

Six Rivers National Forest. On January 7, 2005, the United States Forest Service sent a scoping letter for the Sims Project, stating its intention to log more than 100 acres of forest burned by the Sims Fire. On February 28, 2005, the Forest Service sent a second scoping notice, which provided information about the proposed activities and required comment by March 14. Plaintiffs submitted scoping comments in response to the Forest Service's proposal.

On May 17, 2005, the Forest Supervisor for Six Rivers National Forest issued his Decision Memo on the Sims Fire Salvage Project (Decision). AR 1. Specifically, the Decision approved the logging of approximately 169 acres of the Six Rivers National Forest burned by the Sims Fire. Over 120 acres involved in the Sims Project are within the Grouse Creek Late Successional Reserve and over 50 acres occur within an area designated as Northern Spotted Owl Critical Habitat.

The Decision called for the project to be performed solely by helicopter logging. The Forest Supervisor also determined that the Decision was categorically excluded from documentation in an environmental impact statement (EIS) or environmental assessment (EA) because it fell under an enumerated exception and there were no extraordinary circumstances related to the decision.

In response, plaintiff Forest Service Employees for Environmental Ethics (FSEEE) filed suit in this Court against the Forest Service, claiming that the Decision violated the National Environmental Policy Act (NEPA) and requesting injunctive and declaratory relief (No. C 05-2220 SI). The Environmental Protection and Information Center (EPIC) also filed suit, asserting causes of action under NEPA, the National Forest Management Act (NFMA) and the Forest Service Decision-making Appeals Reform Act (FSDARA); EPIC's case was related to 05-2220 SI by the Court on June 17, 2005. See No. C 05-2227 SI. The parties agreed to forgo litigating a temporary restraining order and instead request that the Court determine whether a preliminary injunction is proper. The Forest Service, which has received bids from contractors to carry out the Sims Project, agreed not to begin logging operations under the Sims Project until the date of the hearing. At the hearing on June 22, 2005, defendant informed the Court that it would voluntarily stay operations until June 24. On June 23, defendant filed a notice with the Court that it was extending the voluntary stay until June 27. See Docket # 26 (05-2220 SI).

Currently before the Court are plaintiffs' motions for preliminary injunction, which request that the Court

prohibit any logging and related activities in the area specified by the Sims Project, until the Court can resolve the matter on the merits. Plaintiffs also request that the Court prohibit defendant pendente lite from entering into any contracts for the sale of timber in the Sims Project area.

## LEGAL STANDARD

The Court has the authority to grant a preliminary injunction in the exercise of its equitable powers. Fed. R. Civ. P. 65. As the Court is acting in equity, the decision to enter a preliminary injunction is largely left to its discretion. See Big Country Foods, Inc. v. Board of Educ. of Anchorage School Dist., 868 F.2d 1085, 1087 (9th Cir. 1989). Traditionally, this rule has been interpreted to require the trial court to consider the likelihood that plaintiff will prevail on the merits and the possible harm to the parties from granting or denying the injunctive relief. See Arcamuzi v. Continental Air Lines, Inc., 819 F.2d 935, 937 (9th Cir. 1987); Sierra On-Line, Inc. v. Phoenix Software, Inc., 739 F.2d 1415, 1421 (9th Cir. 1984).

At the extremes, the party seeking injunctive relief must show either (1) a combination of probable success on the merits and the possibility of irreparable harm, or (2) that serious questions are raised and the balance of hardships tips sharply in the moving party's favor. Miss World (UK) Ltd. v. Mrs. America Pageants, Inc., 856 F.2d 1445, 1448 (9th Cir. 1988); Rodeo Collection, Ltd. v. West Seventh, 812 F.2d 1215, 1217 (9th Cir. 1987). "These are not two distinct tests, but rather the opposite ends of a single 'continuum in which the required showing of harm varies inversely with the required showing of meritoriousness.'" Miss World, 856 F.2d at 1448 (quoting Rodeo Collection, 812 F.2d at 1217). However, in any situation, the Court must find that there is some threat of an immediate irreparable injury, even if that injury is not of great magnitude. Big Country, 868 F.2d at 1088 (citing cases); Oakland Tribune, Inc. v. Chronicle Publishing Co., Inc., 762 F.2d 1374, 1376 (9th Cir. 1985) (citing cases).

## DISCUSSION

Defendant claims that it must begin logging operations under the Sims Project immediately in order to capture the economic value of the timber. Because of this, plaintiffs' motion for preliminary injunction has been forced into an abbreviated schedule. Defendant's oppositions were filed the evening of June 20, and chambers

3

copies were not received for defendant's opposition to EPIC's motion until June 21. Plaintiffs were unable to file reply briefs, because the hearing was held on June 22. In their motions and at the hearing, plaintiffs have raised a number of arguments that certainly give the Court pause when determining their likelihood of success on the merits. Defendant has informed the Court that it will begin logging operations on June 27, 2005, unless the Court grants plaintiffs' request for a preliminary injunction.

It is possible that, once the Court receives full briefing and has an opportunity to consider these issues over an appropriate length of time, defendant will prevail on the merits. However, plaintiffs have presented arguments that the Court believes are strong, or that at least make determining who will succeed on the merits unclear. Additionally, the Court finds that the balance of hardships tips strongly in favor of plaintiffs, given the irreversible nature of environmental harm and that defendant only claims economic harm. Therefore, the Court finds that the prudent course of action at this time is to grant plaintiffs' motion for preliminary injunction. However, the Court understands that defendant has an asset declining in value and is willing to make every effort to resolve this matter through cross-motions for summary judgment in a timely manner.

**1.      Likelihood of success on the merits**

  **A.      NEPA**

Plaintiffs argue that defendant violated NEPA by failing to disclose and analyze the impact of the Sims Project and failing to develop an Environmental Assessment or an Environmental Impact Statement. NEPA requires that all federal agencies must prepare an Environmental Impact Statement (EIS) if a proposed federal action will significantly affect the quality of the environment. 42 U.S.C. § 4332(C). An agency can prepare an Environmental Assessment (EA) to decide whether the environmental impact of a proposed action is significant enough to warrant preparation of an EIS. 40 C.F.R. § 1508.9.

However, agencies can identify certain categories of actions that are categorically excluded from NEPA's requirements. These categories include actions which "do not individually or cumulatively have a significant effect on the human environment and which have been found to have no such effect in procedures adopted by a Federal Agency." 40 C.F.R. § 1508.4. One exemption category adopted by the Forest Service is Category 13, which exempts "salvage of dead and/or dying trees not to exceed 250 acres, requiring no more

4

1   than ½ mile of temporary road construction." AR 1329.

2   However, NEPA recognizes that there may be "extraordinary circumstances" which would make it
3   inappropriate to use the short-cuts embodied in the categorical exemptions. Agencies are required to identify
4   such "extraordinary circumstances." The Forest Service defines extraordinary circumstances precluding
5   categorical exemptions as "conditions associated with a normally excluded action that are identified during
6   scoping as potentially having effects which may significantly affect the environment." Forest Service Handbook
7   1905.15, 30.5. One of the factors to consider in determining whether extraordinary circumstances warrant
8   further environmental analysis is whether the proposed federal action will affect a "federally listed threatened
9   or endangered species or designated critical habitat." AR 1320.

10   In this case, defendant found that the Sims Project was exempt from environmental review because it
11   qualified for the Category 13 exemption as a salvage of dead trees not exceeding 250 acres. Defendant also
12   found that the project did not involve "extraordinary circumstances" because it "was determined that this
13   decision will have 'no effect' on federally listed terrestrial wildlife and botanical species or their critical habitats."
14   A.R. 4. The Decision's finding that there was no impact on the habitat of the northern spotted owl was based
15   on its determination that the Sims Fire made the forest "unsuitable" as spotted owl habitat.

16   All that plaintiffs must show to be successful on their NEPA claim is that there is substantial evidence
17   in the record that the exceptions to the categorical exclusion may apply. California v. Norton, 311 F.3d 1162,
18   1177 (9th Cir. 2002). Essentially, defendant argues that the northern spotted owl's use of burned forest is
19   insufficient to give rise to an extraordinary circumstance because it is not recognized as a habitat by the U.S.
20   Fish and Wildlife Service. However, the record contains some evidence contradicting this position. The
21   Timbered Rock Study presented evidence that the northern spotted owl has locations in areas with high severity
22   burns. See AR 341-369. Additionally, there was evidence presented by Jerry Franklin, Professor of
23   Ecosystem Analysis at the University of Washington, that "[r]etention of large snags and logs are specifically
24   relevant to Northern Spotted Owl since these structures provide the habitat that sustain most of the owl's
25   forest-based prey species." AR 409. If true, this information suggests that the northern spotted owl's habitat
26   could be harmed by the Sims Project, and that the Decision's assertion that the project would have "no effect"
27   on listed species or critical habitat was erroneous.

28

5

The administrative record reflects that the Forest Service considered the Timbered Rock Study "informative," AR 449, but it relied instead, and apparently exclusively, on the suitable habitats designated by the U.S. Fish and Wildlife Service, which did not include severely-burned forest. Id. Indeed, by the time defendant received the Timbered Rock Study on April 15, 2005, AR 340, the biological assessment for the northern spotted owl had already been prepared for almost a month. AR 594. In that assessment, defendant stated that "given the effects of the Sims Fire, there is no suitable habitat within Critical Habitat Unit CA-30 associated with any proposed unit." AR 600. Thus, defendant held the view that severely burned forest could not serve as a suitable habitat for the northern spotted owl before receiving the Timbered Rock Study. After receiving the study, there is no evidence in the record that defendant considered whether this evidence, along with Franklin's submission, created even the possibility that extraordinary circumstances existed precluding the categorical exemption for this project. Instead, defendant simply stuck to its assertion that the northern spotted owl did not benefit from severely burned forest.

Defendant submits the Youngblood declaration to explain why the Timbered Rock Study was found to merely be "informative." However, even if the Court does consider the declaration, there is still evidence in the record that exceptions to the categorical exemption may apply, which is all that is required to prevent the use of the categorical exemption. It appears to the Court, at this early stage, that plaintiffs' likelihood of success on the merits of the NEPA claim is less than it is for their NFMA claim, discussed below. However, plaintiffs could succeed on this claim because there is no evidence in the record that defendant ever considered whether the northern spotted owl benefits from a severely burned forest habitat.

### B.     NFMA

Plaintiff EPIC argues that the Forest Service has violated the NFMA because it failed to ensure that the Sims Project complied with the Six Rivers Land and Resource Management Plan (LRMP) and the Northwest Forest Plan (NFP). Specifically, plaintiff contends that these Plans require the Forest Service to show that all snags to be logged within the LSR are unlikely to persist. Defendant argues that the Plans do not require retention of all snags that are likely to persist, but only of some of them.

The operative language of the Plans is vague, which leads to the dispute between the parties. Both

6

1    Plans state that the Forest Service should "focus on retaining snags that are likely to persist until late
2    successional forest conditions have developed and a new stand is again producing large snags." LRMP at 4-
3    39; NFP at C-14.

4        This language alone raises a possibility that plaintiffs could succeed on the merits. One district court
5    has already ruled in favor of plaintiffs' argument that the NFP requires the retention of all snags that will persist
6    until the next forest develops. <u>Oregon Natural Resources Council v. Brong</u>, 2004 WL 2554575 (D.Or. 2004).
7    In <u>Brong</u>, the Court found that the language in the NFP requiring the government to "focus on retaining snags
8    that are likely to persist until late successional forest conditions have developed and a new stand is again
9    producing large snags" was sufficient to find that all such snags must be retained. <u>Id.</u> at *7. Defendant in this
10   action distinguishes <u>Brong</u> only by stating that it disagrees with the court's ruling and has appealed the matter
11   to the Ninth Circuit.

12       In this case, however, there is something more: the Six Rivers Late Successional Reserves Assessment
13   (LSRA) specifically requires – or at least appears to specifically require – that all such snags be retained. The
14   LSRA states that "where available, snags will be left to meet: [a]ll snags with the potential to persist until the
15   new stand is again producing large snags." LSRA at 6-34. Defendant claims that the requirement that all such
16   snags be retained is a typographical error, and notes that elsewhere the LSRA provides for numerical
17   requirements for large snags, which suggests that some snags can be removed. <u>See</u> Opp'n to EPIC Mot. at
18   19, LSRA at 4-8.

19       In addition, the Snag Analysis by Quentin Youngblood, the Forest Wildlife & Botany Program
20   Manager for the Six Rivers National Forest, states that "[t]he snag retention guidelines proposed for the Sims
21   Fire Salvage Project are less than desirable on a unit-by-unit basis." AR 556. On the next page, defendant
22   also states that "[b]y averaging the snags per acre across this larger scale according to series, seral stage, and
23   fire severity the recommended snag levels have been met even though unit-by-unit levels are less than
24   desirable." AR 557. At oral argument, defense counsel contended that these statements, too, were
25   typographical errors, the result of drafting the document from a template.

26       At this early stage, the Court finds that 1) Youngblood's statements in the Snag Analysis, 2) the
27   statement in the LSRA that "all snags" that can persist should remain, 3) the ambiguous language of the NFP
28

7

and LRMP that the defendant should "focus on retaining snags that are likely to persist" and 4) the holding of Brong create a substantial likelihood of success on the merits. The Court refuses to brush these arguments aside in a conclusory manner simply because defendant wishes to begin logging immediately.

### C.  FSDARA

Under the FSDARA, the Forest Service must "establish a notice and comment process for proposed actions of the Forest Service concerning projects and activities implementing land and resource management plans" and provide an opportunity for citizens to administratively appeal these projects. 16 U.S.C. § 1612. Plaintiffs claim that the Sims Project is a project implementing the Six Rivers Land and Resource Management Plan, and that the USFS should therefore have provided an opportunity to appeal its Decision on the project. Defendant argues that it has properly excluded from the FSDARA all projects that qualify as for NEPA categorical exemptions. Defendant asserts that plaintiffs' theory is too broad and would require appeals for all applications of the LRMP, including repair and maintenance to administrative sites.

The Court finds that it is unnecessary to determine plaintiff's likelihood of success on the merits of this issue, as it has already found that plaintiff has demonstrated sufficient likelihood for the two previous issues. Therefore, the Court will withhold making a determination on this issue until summary judgment.

### 2.  **Irreparable harm**

Plaintiffs claim that they will suffer irreparable injury if the Court does not grant their motion for a preliminary injunction because the Forest Service is scheduled to allow logging under the Sims Project immediately. Defendant argues that plaintiffs will not be harmed because they have presented no credible evidence to support their claim that the removal of snags will harm the northern spotted owl.

Defendant also asserts that it and the public will be harmed if the Court grants plaintiffs' motion because the value of the burned timber will decrease as time passes. Currently, defendant has a high bid of $661,791 for the Sims Project. See Bergstrom Declaration. However, the value of the contract will be reduced as the timber is damaged by the elements. Thus, defendant argues that the logging must occur during this harvest season in order for the timber to have commercial value. Additionally, defendant claims that the helicopters

8

needed for the project will be unavailable later in the summer because they will be needed to fight forest fires. Therefore, defendant states that the project will not be implemented if it is not started by June 30, 2005.

The Supreme Court has noted that "[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable." Amoco Prod. Co. v. Village of Gambell, 480 U.S. 531, 545 (1987). Additionally, any possible financial hardship suffered by defendant is "outweighed by the fact the old growth forests plaintiffs seek to protect would, if cut, take hundreds of years to reproduce." Idaho Sporting Congress, Inc. v. Alexander, 222 F.3d 562, 569 (9th Cir. 2000). Additionally, courts "have recognized that timber cutting causes irreparable damage and have enjoined cutting when it occurs without proper observance of NEPA procedures and other environmental laws." Portland Audubon Society v. Babbitt, 795 F.Supp. 1489, 1509 (D.Or. 1992).

Plaintiffs presented evidence that conducting salvage programs in fire-damaged late successional reserves is "inappropriate" because it "would interfere with the natural recovery processes." AR 413. This is because large snags and logs are the "most important surviving structural elements or biological legacies of a forest disturbance, excepting only large live trees." Id. Plaintiffs also present evidence that dead trees can persist after a fire for decades, as standing snags or logs on the forest floor. These trees provide "a substrate for insects on which woodpeckers feed, a source of nutrients for the new tree seedlings, and homes for small mammals and birds." Ferrell Decl. at ¶ 5.

Additionally, the Court finds it difficult to reconcile the timeline of the Sims Project with defendant's claim of harm. Specifically, defendant argues that "helicopter use to fly the felled logs from the stands to the landings must be substantially completed by approximately August 15." Bergstrom Decl. at ¶ 6. Defendant chose the August 15 date because "by mid-August, the likelihood that wildfires will divert logging helicopter use from the Sims Fire Salvage Project will be almost 100%." Id. However, under the Decision issued by the Forest Supervisor, the project will not even begin in two of the eight units until after August 31. AR 2. The project cannot begin in Units 100 and 400 until September 1 because of the "potential for noise disturbance to the northern spotted owl, fisher and the northern goshawk during the breeding season." Id. Units 100 and 400 both must be logged by helicopter and consist of 26 acres. Id. If the logging must occur by August 15, then it is impossible for Units 100 and 400 to be logged. However, defendant has not asserted that this is the

9

case.

On balance, the Court finds that plaintiffs have demonstrated irreparable harm if the Court does not grant the motion for a preliminary injunction, based on the environmental value of the trees subject to logging and the irreversible nature of logging. Additionally, defendant's only harm is economic, which has been found to be of significantly less importance than environmental harm when courts determine irreparable harm. Finally, the Court is skeptical that logging must begin immediately, as claimed by defendant, when the Sims Project Decision requires two of the eight units to begin logging operations after August 31.

## CONCLUSION

For the foregoing reasons and for good cause shown, the Court hereby GRANTS plaintiffs' motion for preliminary injunction. Therefore, the Court ORDERS that defendant, its agents, officers and employees are preliminarily enjoined from awarding the contract for the Sims Fire Salvage Project, harvesting any trees pursuant to the May 17, 2005 Decision Memo or undertaking any further action until this case can be heard and decided on the merits. The Court finds that plaintiffs do not need to post a bond in this case.

The Court will schedule dispositive motions at the earliest convenient date suggested by the parties, so as to assure a prompt decision on the merits.

**IT IS SO ORDERED.**

Dated: June 27, 2005
          S/Susan Illston
          SUSAN ILLSTON
          United States District Judge